## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| VINCENT WISE, an individual, | |
| Plaintiff, | Case No. _____ |
| v. | **COMPLAINT AND JURY DEMAND** |
| BIOWISH TECHNOLOGIES, INC., a Delaware corporation; BIOWISH TECHNOLOGIES INTERNATIONAL, INC., a Delaware corporation; BIG I INVESTMENTS, LLC, a Delaware limited liability company; MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C., a Massachusetts professional corporation; JUVENTA TECHNOLOGIES, INC., a Delaware corporation; JUVENTA TECHNOLOGIES HOLDINGS, INC., a Delaware corporation; IAN EDWARDS, an individual; IRWIN HELLER, an individual; NABIL SAKKAB, an individual; ROD VAUTIER, an individual; MARK McGRATH, an individual; JEFFREY McCORMICK, an individual; GEOFF ROSENHAIN, an individual, | |
| Defendants. | |

COMES NOW, Plaintiff Vincent Wise ("Wise") and alleges, avers, and complains of Defendants Biowish Technologies, Inc.; Biowish Technologies International, Inc.; Big I Investments, LLC; Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.; Juventa Technologies, Inc.; Juventa Technologies Holdings, Inc.; Ian Edwards; Irwin Heller; Nabil Sakkab; Rod Vautier; Mark McGrath; Jeffrey McCormick; and Geoff Rosenhain (collectively, "Defendants") as follows:

## PARTIES, JURISDICTION, AND VENUE

1.       Wise is a citizen of Australia.

1

2.      Wise is informed, believes, and thereon alleges that Biowish Technologies, Inc. was at all relevant times herein a Delaware corporation with its principal place of business in Ohio.

3.      Wise is informed, believes, and thereon alleges that Biowish Technologies International, Inc. was at all relevant times herein a Delaware corporation with its principal place of business in Ohio.

4.      As alleged more fully herein, Defendants have consistently and repeatedly failed to furnish Wise with even the most basic information concerning the Delaware corporations in which Wise holds stock.  Therefore, at this time, the precise relationship between Biowish Technologies, Inc. and Biowish Technologies International, Inc. is unclear to Wise.  At all times relevant to his claims alleged herein, however, Wise was a shareholder in Biowish Technologies, Inc. and Biowish Technologies International, Inc. (referred to collectively hereafter as "Biowish").

5.      Wise is informed, believes, and thereon alleges that Juventa Technologies Inc. was at all relevant times herein a Delaware corporation with its principal place of business in Utah.

6.      Wise is informed, believes, and thereon alleges that Juventa Technologies Holdings, Inc. was at all relevant times herein a Delaware corporation with its principal place of business in Utah.

7.      As alleged more fully herein, Defendants have consistently and repeatedly failed to furnish Wise with even the most basic information concerning the Delaware corporations in which Wise holds stock.  Therefore, at this time, the precise relationship between Juventa Technologies Inc. and Juventa Technologies Holdings, Inc. is unclear to Wise.  At all times

relevant to his claims alleged herein, however, Wise was a shareholder in Juventa Technologies Inc. and/or Juventa Technologies Holdings, Inc. (referred to collectively hereafter as "Juventa").

8.      Wise is informed, believes, and thereon alleges that Big I Investments, LLC ("Big I") was at all relevant times herein a Delaware limited liability company owned by Ian Edwards and Irwin Heller and a shareholder in Biowish and Juventa.

9.      Wise is informed, believes, and thereon alleges that Mintz, Levin, Cohn, Ferris, Glovsky and Pompeo, P.C. ("Mintz Levin") was at all relevant times herein a Massachusetts professional corporation that provided legal services to Biowish, Juventa, and related individuals. Mintz Levin is a law firm that holds itself out as "an international law firm with a global reach" with expertise in all aspects of corporate governance.  On information and belief, Mintz Levin regularly represents and advises Delaware entities and related individuals and appears in Delaware courts.

10.     Wise is informed, believes, and thereon alleges that Ian Edwards ("Edwards") was at all relevant times herein an officer and director of Biowish and a 50% owner of Big I.

11.     Wise is informed, believes, and thereon alleges that Irwin Heller ("Heller") was at all relevant times herein an officer and director of Juventa; an officer of Biowish; legal counsel to Biowish, Juventa, and related individuals; a partner in Mintz Levin; and a 50% owner of Big I.

12.     Wise is informed, believes, and thereon alleges that Nabil Sakkab ("Sakkab") was at all relevant times herein chairman of the board of directors for Biowish and a shareholder in Biowish and Juventa.

13.     Wise is informed, believes, and thereon alleges that Rod Vautier ("Vautier") was at all relevant times herein chairman of the board of directors for Juventa, officer and employee of Biowish, and a shareholder in Biowish and Juventa.

14.     Wise is informed, believes, and thereon alleges that Mark McGrath ("McGrath") was at all relevant times herein a director of Juventa, advisor to Biowish, and a shareholder in Biowish and Juventa.

15.     Wise is informed, believes, and thereon alleges that Jeffrey McCormick ("McCormick") was at all relevant times herein a director of Biowish, a shareholder in Biowish and Juventa, and a principal of Saturn Partners.

16.     Wise is informed, believes, and thereon alleges that Geoff Rosenhain ("Rosenhain") was at all relevant times herein a director and shareholder of both Juventa and Biowish.

17.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367.

18.     Defendants Edwards, Heller, Sakkab, Vautier, McGrath, McCormick, and Rosenhain are subject to personal jurisdiction in Delaware, pursuant to 10 *Del. C.* § 3114, by virtue of their service as directors and officers of Biowish and/or Juventa.

19.     Defendants Mintz Levin and Heller are subject to personal jurisdiction in Delaware, pursuant to 10 *Del. C.* § 3104, because they directly transacted business and contracted to supply services in Delaware, including the provision of legal services related to the transactions at issue in this action.  Additionally, Defendants' actions caused tortious injury to and affected the ownership of Delaware entities and their shareholders.  Those injuries have a direct nexus to Defendants' legal malpractice and breaches of fiduciary duty, which included acts or omissions in Delaware.

20.     All Defendants have sufficient minimum contacts with the State of Delaware so as to make the exercise of jurisdiction over Defendants in this State foreseeable and reasonable under the facts and circumstances alleged herein.

## GENERAL ALLEGATIONS

**Background**

21.     In 2007, Wise cofounded Biowish Technologies Pty Ltd., an Australian company and the predecessor to Delaware corporations Biowish Technologies Inc. (formed in 2009) and Biowish Technologies International (formed in 2012).  At the time Biowish was founded, Wise became a one-third owner of the company.

22.     Biowish provides natural biotechnology solutions for agriculture and environmental management industries, including wastewater treatment, aquaculture, hydrocarbon remediation, waste management, and food quality.

23.     Initially, Wise served as Executive Chairman of Biowish.

24.     In 2008, Biowish raised approximately $3 million in capital by bringing in additional investors, including Big I and Sakkab, reducing Wise's share in Biowish to approximately twenty-five percent.

25.     Biowish soon took on additional investors, including McGrath and Rosenhain, further reducing Wise's share of ownership in Biowish to approximately twenty-two percent.

26.     Unbeknownst to Wise, Big I, Sakkab, and Rosenhain were long-term business associates and friends.

27.     By virtue of his investment, Sakkab became chairman of the board of Biowish in or around 2008.

28.     Although McGrath did not take a position on Biowish's board, he acted as an advisor to the board and was a significant shareholder in Biowish.

29.     Rosenhain became a member of Biowish's board of directors.

30.     Through Big I's investment in Biowish, Edwards became a member of the board of directors and CEO of Biowish.

31.     Heller—the other Big I owner—took a position as secretary of Biowish and acted as a legal advisor to the company.

32.     Heller is also a former managing partner of Mintz Levin and served on the firm's executive committee for many years.

33.     Mintz Levin, through Heller and other attorneys, routinely provided legal services to Biowish and individuals related to Biowish.

34.     Throughout 2011 and 2012, Biowish continued to seek additional capital infusions.

35.     One proposed source of funding came from Saturn Partners, a venture capital firm.

36.     Wise was extremely skeptical of the Saturn Partners deal because Saturn Partners would receive preferential shareholder status, the proposal significantly undervalued Biowish, and the Biowish board—then dominated by Sakkab, Rosenhain, and Edwards—had refused to pursue other sources of capital beyond Saturn Partners.

37.     Heller took the lead in negotiating the Saturn Partners deal and Mintz Levin prepared the documentation.

38.     Unbeknownst to Wise at the time, Heller and Edwards were close friends with the principals of Saturn Partners, including Jeffrey McCormick.

39.     Also unknown to Wise at the time, Big I—Heller's and Edwards' investment vehicle—had a long-term business relationship with Saturn Partners.

40.     On information and belief, Big I was also a financial investor in Saturn Partners.

41.     However, when Wise requested additional information about the relationship between Big I and Saturn Partners, he received no such information.

42.     Following the Saturn Partners deal, McCormick received a seat on Biowish's board of directors, leaving the board dominated by Sakkab, Rosenhain, Edwards, and McCormick.

43.     Although not a member of the board, Heller acted as an advisor to the board and held the position of secretary of Biowish.

44.     McGrath also remained an advisor to the board.

45.     Thus, following these rounds of capital investment, Biowish's board became dominated by a group of people who—unbeknownst to Wise—were long-term friends, business associates, and investment partners.

46.     Despite these rounds of investment, Biowish remained consistently short of cash.

47.     Wise repeatedly raised concerns about the company's refusal to focus on its core products and the board's wasteful spending habits.

48.     For example, on information and belief, the Biowish board voted to give themselves share allotments, even while the company struggled with cash flow problems.

49.     On information and belief, the Biowish board also voted to give themselves beneficial compensation packages, all while Biowish was short on cash.

50.    In 2012, Wise resigned his position on Biowish's board of directors, citing the board's lack of focus and inability to control spending, but remained a substantial shareholder of Biowish.

**Formation of Juventa and Juventa's Relationship to Biowish**

51.    In February 2012, Biowish's board of directors decided to create a separate independent company, Juventa, to develop and commercialize Biowish's human health intellectual property.

52.    Initially, the board of directors for Juventa consisted of Wise, Vautier, Stan Weiss ("Weiss"), Heller, McGrath, and Rosenhain.

53.    Of the initial board of Juventa, all except Weiss were also officers or directors of Biowish.

54.    Biowish shareholders, including Wise, also received shares in Juventa.

55.    Wise received 18,174 shares of Juventa stock, representing just over eighteen percent of the new company's ownership.

56.    On information and belief, Wise was the largest shareholder in Juventa.

57.    On information and belief, Heller and other Mintz Levin attorneys regularly provided legal advice to Juventa and individuals associated with Juventa, including legal research and drafting of documents.

58.    Biowish entered into a license agreement (the "License Agreement") with the newly formed Juventa, under which Biowish granted Juventa an exclusive, perpetual, irrevocable, and royalty-bearing license to market, use, have used, have manufactured, supply, sell, offer to sell, import, have imported, and otherwise commercialize certain Biowish technology and intellectual property (the "Licensed Technology").

59.     Upon information and belief, the License Agreement was prepared by Mintz Levin.

60.     Upon information and belief, the draft of the License Agreement attached hereto as Exhibit A reflects the ultimate terms of the License Agreement.

61.     The License Agreement provided that Juventa "shall have the sole right and responsibility for, and shall have full control and authority over" the marketing and commercialization of the Licensed Technology.  [Ex. A § 3.1.]

62.     Juventa agreed to use "Commercially Reasonable Efforts" to market and commercialize the Licensed Technology and to commit "such resources . . . it deems necessary to conduct such marketing and [c]ommercialization activities."  [Ex. A § 3.2.]

63.     The License Agreement defined "Commercially Reasonable Efforts" as "the efforts and resources typically used by [Juventa] in the marketing or commercialization of products of comparable market potential, taking into account all relevant factors including, as applicable, the stage of development, efficacy and safety relative to competitive products in the marketplace, actual or anticipated approved labeling, the nature and extent of market exclusivity, and the cost and likelihood of obtaining [m]arket [a]uthorizations."  [Ex. A § 1.12.]

64.     Juventa agreed to pay a royalty based on annual net sales of each product.  [Ex. A § 4.1.1.]

65.     Annual net sales were determined separately for each product sold in a given calendar year.  [Ex. A § 4.1.1.]

66.     Annual net sales were calculated beginning from the "First Commercial Sale" of each product and ending with the last day of the "Royalty Term," defined as "the period beginning on the date of the First Commercial Sale of such Product in such country and ending

on the later of (a) the expiration of the last to expire" patent rights related to the product and "(b) fifteen (15) years from the date of the First Commercial Sale of such Product in such country." [Ex. A § 1.42.]

67.     The royalty rates varied based on whether the product was a prescription or non-prescription product and whether the product was covered by an unexpired Biowish patent or pending patent.  [Ex. A § 4.1.1.]

68.     Juventa was required to make such royalty payments within thirty days after the end of the calendar quarter in which qualifying sales were made.  [Ex. A § 4.1.2.]

69.     Biowish was granted the right to request an independent audit of Juventa's accounting to determine that royalty payments were accurately calculated.  [Ex. A § 4.1.3.]

70.     The parties agreed that the result of such an audit "shall be binding on both Parties absent manifest error."  [Ex. A § 4.1.3.]

71.     If Juventa underpaid required royalties, it was required to pay the shortfall within thirty days of receiving an audit showing the shortfall.  [Ex. A § 4.1.3.]

72.     The License Agreement contained a termination provision that read:

> Either Party may terminate this [License] Agreement, effective immediately upon written notice to the other Party, for a material breach by the other Party of any term of this [License] Agreement that remains uncured sixty (60) days (thirty (30) days in the event that the breach is a failure of a Party to make any payment required hereunder) after the non-breaching Party first gives written notice to the other Party of such breach and its intent to terminate this [License] Agreement if such breach is not cured. Notwithstanding the foregoing, if the breach is with respect to the failure of a Party to make any payment required hereunder in a given country, the termination shall only apply to such country. For purposes of clarity, the obligation of the breaching Party to cure any such breach shall be stayed for any time period during which such breach is the subject of a dispute resolution proceeding pursuant to Section 11.1; provided, that, the obligation of the breaching Party to cure such breach . . . shall resume commencing on the date of any final resolution of such proceeding.

[Ex. A § 8.2.1 (emphasis added).]

73.     The parties agreed to refer any disputes arising from the License Agreement to the CEO of each party to informally resolve such disputes.  [Ex. A § 11.1.]

74.     If the CEOs were unable to resolve the dispute within thirty days, the parties were required to submit the dispute to a third party mediator within ten days.  [Ex. A § 11.1.]

75.     If the dispute was not resolved in mediation, the License Agreement required that the matter "shall be resolved by arbitration pursuant to the provisions of Section 11.2."  [Ex. A § 11.1.]

76.      The parties agreed that "[a]ny Disputed Matter arising out of or relating to this Agreement shall be submitted by the Parties to binding arbitration under the rules then in effect . . . of the American Arbitration Association."  [Ex. A § 11.2(a).]

77.     Thus, the License Agreement unequivocally provided that Juventa would be provided with an opportunity to cure any alleged failures to make royalty payments, that disputes between Biowish and Juventa related to the License Agreement would be submitted to mediation and arbitration, and that any obligation to cure an alleged breach would be stayed pending the outcome of the dispute resolution process.

**Biowish Insiders Control Juventa and Manufacture a Breach of the License Agreement**

78.     Juventa was successful in developing and commercializing at least ten products based on Biowish's Licensed Technology, including products incorporating Triclyst, a probiotic with powerful anti-inflammatory and anti-oxidative benefits.

79.     Despite Juventa's successful development of a number of products, the company continued to experience management difficulties stemming from the board members' close relationships with Biowish.

80.     Frustrated with the mismanagement taking place at Juventa, Wise resigned his position on the board of directors in or around April 2013.

81.     Following Wise's resignation, Juventa's board of directors consisted almost entirely of insiders from Biowish (the "Biowish Insiders").

82.     Vautier, who had been fired from his position as CEO of Biowish for incompetence was installed as chairman of the board of Juventa.

83.     Edwards, then CEO of Biowish, was instrumental in Vautier's appointment as Juventa's chairman.

84.     While serving as Juventa's chairman, Vautier was also an officer of Biowish, serving as Biowish's vice president of sales and marketing.

85.     Wise protested Vautier's appointment as chairman, arguing that Vautier lacked the industry knowledge and connections necessary to properly manage Juventa's activities.

86.     Other members of Juventa's board, including Heller, agreed that Vautier was not the best person for the job, but refused to take action to replace him.

87.     On information and belief, the Biowish Insiders refused to replace Vautier because they wanted to maintain Biowish loyalists as a majority of the Juventa board.

88.     Despite Juventa's success in developing products based on the Licensed Technology, the company suffered from cash-flow problems typical of a start-up company.

89.     On information and belief, approximately one month after Craig Duchossois ("Duchossois"), a wealthy venture capitalist, invested in Juventa, Biowish and the Biowish Insiders conspired to shut down Juventa entirely.

90.     In or around March 2015, Biowish sent Juventa a letter (the "March Letter") alleging that Juventa had breached the License Agreement and threatening to terminate the Licensing Agreement if the purported breaches were not cured.

91.     On information and belief, none of the purported breaches were, in fact, breaches of the License Agreement.

92.     On information and belief, Juventa had, in fact, paid Biowish substantially more royalties than Biowish was entitled to under the License Agreement.

93.     On information and belief, Biowish had demanded the excess royalty payments in order to transfer a disproportionate amount of revenues away from Juventa and to Biowish to assist with <u>Biowish's</u> cash flow problems.

94.     On information and belief, the Juventa board—dominated by the Biowish Insiders—agreed to this arrangement in violation of their fiduciary obligations to Juventa and its shareholders, including Wise.

95.     On information and belief, Biowish also cited Juventa's purported failure to repay an unrelated $60,000 loan (the "Loan") as a breach of the License Agreement.

96.     On information and belief, the other alleged breaches included allegations that Juventa had failed to use "Commercially Reasonable Efforts" to market and commercialize the Licensed Technology and failed to appropriately pay royalties to Biowish.

97.     However, on information and belief, the March Letter failed to identify a single instance in which Juventa failed to make royalty payments

98.     On information and belief, the March Letter was a sham attempt by Biowish to get out of the License Agreement.

99.     Despite the fact that the License Agreement contained clear cure and dispute resolution provisions, on information and belief, the Biowish Insiders refused to take steps to challenge Biowish's allegations or otherwise protect the interests of Juventa and its shareholders.

100.     On information and belief, the Biowish Insiders failed to contest the false statements contained in the March Letter or to inform Juventa's shareholders of the weaknesses of the March Letter, despite the fact that the March Letter purported to deprive Juventa of its most valuable asset, the License Agreement.

101.     On information and belief, in mid-April 2015, Weiss—then-CEO of Juventa— located a group of investors willing to invest $1 million in Juventa, which would have allowed Juventa to continue developing products using the Licensed Technology.

102.     On information and belief, a meeting of Juventa's board of directors occurred on or about April 17, 2015, in which Weiss attempted to present the terms of the proposed investment in Juventa.

103.     On information and belief, Heller—a Biowish Insider—interrupted Weiss' presentation, stating that he "could cut the conversation short," or words to that effect.

104.     On information and belief, Heller insisted that if Juventa could not immediately repay Biowish for the Loan, the License Agreement was terminated and there was nothing more to discuss.

105.     On information and belief, the alleged failure to repay the unrelated Loan could not have constituted a breach of the License Agreement and, in any event, the potential investment of $1 million would have allowed Juventa to repay the $60,000 owed.

106.     On information and belief, Heller then advised the Juventa board members that the Juventa shareholders participate in a "Contribution Agreement" under which Juventa and its

shareholders would surrender all rights under the License Agreement and to any and all trademarks in favor of a newly created company being established by Biowish as a wholly owned subsidiary.

107.    On information and belief, Mintz Levin prepared the Contribution Agreement.

108.    On information and belief, Heller advised the Juventa board members that Juventa's board did not need to provide Juventa's shareholders with alternatives to the Contribution Agreement, such as the potential for other outside investment.

109.    On information and belief, Heller then called for an immediate vote of Juventa's board and, as soon as the Biowish Insiders indicated their agreement with Heller's recommendation, announced that the majority of the board had approved the measure.

110.    On information and belief, no discussion among the non-Biowish Insider board members was allowed.

111.    On information and belief, no disclosure of any alternatives to the Contribution Agreement was ever made to Juventa shareholders, including Wise.

112.    On information and belief, Biowish and the Biowish Insiders stood to benefit disproportionately from depriving Juventa and its shareholders—including Wise as the largest shareholder—of the License Agreement in favor of Biowish's newly created subsidiary.

113.    In light of their clear conflict of interest, the Biowish Insiders should have recused themselves from any decision related to the Contribution Agreement.

114.    On information and belief, the Biowish Insiders stifled any dissent and refused to allow the disinterested directors to explore the possibility of outside investment because such outside investment would have resulted in Biowish losing control of Juventa's board.

115.     On information and belief, rather than allow non-Biowish Insiders to control Juventa—and the Licensed Technology—the Biowish Insiders conspired with Biowish to manufacture a breach of the License Agreement, reject any proposed outside investment, and ultimately terminate the License Agreement.

116.     On information and belief, Biowish also withheld key research results from Juventa that Biowish was obligated to provide, hampering Juventa's ability to develop and commercialize products based on the Licensed Technology.

117.     Wise was unaware of these events as they unfolded.

118.     In or around May 2015, Edwards and Heller contacted Wise to discuss Juventa's situation, despite the fact that Edwards was CEO of Biowish and had no official role at Juventa.

119.     At the time, Wise was suffering from severe depression, a fact that was known by Heller and Edwards.

120.     Heller and Edwards explained that Juventa was struggling financially and that Juventa and Biowish faced potential legal liability from Duchossois stemming from his recent investment.

121.     Neither Heller nor Edwards informed Wise about the circumstances surrounding Duchossois' investment.

122.     Heller advised Wise that Wise should sign the Contribution Agreement and that if Wise did not sign the agreement, he stood to lose the entirety of his interest in both Juventa and Biowish and could face additional legal liability.

123.     Neither Heller nor Edwards ever informed Wise about the potential for other outside investment in Juventa or the circumstances under which the Juventa board approved the Contribution Agreement.

124.  Neither Heller nor Edwards ever informed Wise about the circumstances related to the supposed breaches of the License Agreement by Juventa.

125.  Wise was told by Heller and Edwards that Juventa was no longer a going concern and that its assets were essentially valueless.

126.  Wise was further informed by Heller and Edwards that the Contribution Agreement would provide that certain Juventa shareholders would receive Biowish stock in exchange for Juventa's assets, but that because of the low value of Juventa's assets, Wise would receive no Biowish stock in exchange for his share of Juventa.

127.  For example, on information and belief, Duchossois received 400,000 shares of Biowish stock as part of the Contribution Agreement.

128.  Heller never told Wise that he should seek other legal counsel.

129.  Nor did Heller ever tell Wise that Heller was not acting as Wise's legal counsel.

130.  Instead, Heller advised Wise about his legal rights and potential liabilities.

131.  In reliance on that advice, Wise executed the Contribution Agreement.

132.  Under the Contribution Agreement, Wise received no compensation for his Juventa shares.

133.  On information and belief, certain favored Juventa shareholders were compensated for their Juventa shares through a grant of Biowish shares.

134.  On information and belief, the grant of Biowish shares was designed and intended to silence any potential dissent among Juventa shareholders, thereby allowing Biowish to re-take the Juventa assets in violation of the License Agreement.

135.  On information and belief, Biowish diluted Wise's ownership of Biowish to compensate favored Juventa shareholders.

136.    Thus, as a result of the Contribution Agreement, Wise received no value from his Juventa shares and—at the same time—lost substantial portions of the value of his Biowish shares.

137.    Wise did not become aware of the events described herein until approximately September 2017.

138.    Wise has been substantially injured as a result of Defendants' unethical and illegal actions.

139.    Although Wise does not yet know the full extent of his damages, he estimates his financial losses exceed $3,000,000.

**FIRST CLAIM FOR RELIEF**
**(Breach of Fiduciary Duty – Biowish Insiders)**

140.    Wise hereby incorporates the foregoing paragraphs of the above Complaint by reference, as if fully set forth herein.

141.    As officers and directors of Juventa, the Biowish Insiders owed duties of loyalty, care, honesty, good faith, and candor to Juventa and its shareholders.

142.    As described above, the Biowish Insiders breached their fiduciary duties to Juventa and its shareholders by, at a minimum, placing Biowish's interests above those of Juventa, failing to disclose critical and material information to Juventa shareholders, manufacturing a breach of the License Agreement, restraining Juventa's ability to raise capital and develop products, and by ultimately transferring all of Juventa's assets to a newly created wholly owned subsidiary of Biowish.

143.    As a result of the breaches described herein, Wise has been damaged in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
**(Breach of Fiduciary Duty – Biowish, Edwards, Heller, Sakkab, McCormick, Rosenhain)**

144.    Wise hereby incorporates the foregoing paragraphs of the above Complaint by reference, as if fully set forth herein.

145.    As officers and directors of Biowish, Edwards, Heller, Sakkab, McCormick, and Rosenhain (collectively, the "Biowish Control Group") owed duties of loyalty, care, honesty, good faith, and candor to Biowish and its shareholders, including Wise.

146.    As described above, the Biowish Control Group breached their fiduciary duties to Wise by, at a minimum, failing to disclose critical and material information to Wise, compensating favored Juventa shareholders using Biowish assets, and diluting Wise's share of Biowish to stifle potential dissent among Juventa shareholders.

147.    As a result of the breaches described herein, Wise has been damaged in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
**(Legal Malpractice/Professional Negligence – Heller, Mintz Levin)**

148.    Wise hereby incorporates the foregoing paragraphs of the above Complaint by reference, as if fully set forth herein.

149.    An attorney-client relationship—either express or implied—existed between Wise, as the client, and Heller and Mintz Levin, as legal counsel.

150.    As a result of that relationship, Heller and Mintz Levin owed Wise duties of care, candor, and loyalty.

151.    As described above, Heller and Mintz Levin failed to exercise reasonable care, skill, and professional judgment in advising Wise with relation to the Contribution Agreement.

152.    Wise reasonably relied on Heller's advice.

19

153.    As a result of that reliance, Wise was damaged in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### (Breach of Fiduciary Duty – Heller)

154.    Wise hereby incorporates the foregoing paragraphs of the above Complaint by reference, as if fully set forth herein.

155.    An attorney-client relationship—either express or implied—existed between Wise, as the client, and Heller, as legal counsel.

156.    As a result of that relationship, Heller owed Wise duties of care, candor, and loyalty.

157.    As described above, Heller breached his fiduciary obligations to Wise by failing to disclose critical information about the Contribution Agreement, which benefitted Heller personally, and by failing to place Wise's interests above others as a result of significant conflicts of interest.

158.    As a result of the breaches described herein, Wise has been damaged in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty – Mintz Levin)

159.    Wise hereby incorporates the foregoing paragraphs of the above Complaint by reference, as if fully set forth herein.

160.    Through his roles as legal counsel and director of Juventa, Heller owed fiduciary obligations to Juventa and its shareholders, including Wise.

161.    As described above, Heller breached his fiduciary obligations to Wise by failing to disclose critical information about the Contribution Agreement, which benefitted Heller

personally, and by failing to place Wise's interests above others as a result of significant conflicts of interest.

162.    Mintz Levin had knowledge of Heller's breaches by virtue of Heller's status as a senior partner at the firm.

163.    On information and belief, Mintz Levin substantially participated in Heller's breaches because Heller regularly made use of Mintz Levin resources—including other Mintz Levin attorneys—in his roles as legal counsel and director of Juventa and because Mintz Levin regularly provided legal counsel and assistance to Biowish, Juventa, and related individuals.

164.    On information and belief, Mintz Levin prepared the Contribution Agreement at issue in this litigation.

165.    On information and belief, Heller and other Mintz Levin attorneys acted within the scope of their employment or agency relationship with Mintz Levin, rendering Mintz Levin liable for all of the acts, omissions, or other misconduct that contributed to Wise's injuries.

166.    As a result of Mintz Levin's actions, Wise has been damaged in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**(Securities Fraud, 15 U.S.C. § 78j, 17 C.F.R. § 240.10b-5 – Heller and Edwards)**

167.     Wise hereby incorporates the foregoing paragraphs of the above Complaint by reference, as if fully set forth herein.

168.    As described above, Heller and Edwards falsely told Wise that Juventa could no longer continue as a going concern or, in the alternative, failed to disclose alternatives to the Contribution Agreement and Biowish's actions that contributed to Juventa's difficulties.

169.    Heller and Edwards also falsely represented to Wise that he could face legal liability from Duchossois if Wise did not execute the Contribution Agreement.

170.    Heller and Edwards made these statements knowing they were false and intending to induce Wise to execute the Contribution Agreement.

171.    In reliance on the representation, Wise executed the Contribution Agreement.

172.    Wise received no compensation for his Juventa shares and Wise's Biowish shares were substantially diluted.

173.    As a result of Heller's and Edwards' actions, Wise has been damaged in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
### (Fraud in the Inducement – Heller and Edwards)

174.    Wise hereby incorporates the foregoing paragraphs of the above Complaint by reference, as if fully set forth herein.

175.    As described above, Heller and Edwards falsely told Wise that Juventa could no longer continue as a going concern and, while obligated to so inform Wise, failed to disclose alternatives to the Contribution Agreement and Biowish's actions that contributed to Juventa's difficulties.

176.    Heller and Edwards knew that Biowish was interfering with Juventa's operations and that the possibility of other investment was available.

177.    Heller and Edwards, knowing Wise was suffering from severe depression at the time, intended to induce Wise into executing the Contribution Agreement and to refrain from dissenting to the proposal.

178.    In reliance on Heller's and Edwards' representations, Wise executed the Contribution Agreement.

179.    As a result of the Contribution Agreement, Wise received no compensation for his Juventa shares and Wise's Biowish shares were substantially diluted.

180.    As a result of Heller's and Edwards' actions, Wise has been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Wise prays for judgment against Defendants as follows:

1.    For judgment in favor of Wise and against Defendants on all of Wise's claims;

2.    For an award of all available damages, including general and consequential damages;

3.    For an award of punitive damages as permitted by law;

4.    For an award of pre-judgment and post-judgment interest on all applicable amounts;

5.    For an award of all attorney fees, costs, and expenses incurred by Wise, as allowed by law; and

6.    For such other and further relief as the Court may deem proper and just.

## JURY DEMAND

Wise demands a trial by jury.

Dated:  May 3, 2018

WILKS, LUKOFF & BRACEGIRDLE, LLC

*/s/ Thad J. Bracegirdle*
Thad J. Bracegirdle (DSBA No. 3691)
4250 Lancaster Pike, Suite 200
Wilmington, Delaware 19805
Telephone: (302) 225-0850
Fax: (302) 225-0851
E-Mail: tbracegirdle@wlblaw.com

PARR BROWN GEE & LOVELESS, P.C.
Jonathan O. Hafen
Cynthia D. Love
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
Fax: (801) 532-7750
E-Mail: jhafen@parrbrown.com
         clove@parrbrown.com

*Attorneys for Plaintiff*